UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,                    :

         Plaintiff,                          :    Criminal Action No.
                                                  1:19-cr-10312-LTS
      v.                                     :

MATTHEW HAVILAND,                            :

         Defendant.                          :

- - - - - - - - - - - - - - - - - - - x


     BEFORE THE HONORABLE LEO T. SOROKIN, DISTRICT JUDGE


                          RULE 11


                 Tuesday, September 17, 2019
                        11:45 a.m.




John J. Moakley United States Courthouse
Courtroom No. 13
One Courthouse Way
Boston, Massachusetts


Rachel M. Lopez, CRR
Official Court Reporter
raeufp@gmail.com

**A P P E A R A N C E S**


On behalf of the Plaintiff:

    UNITED STATES ATTORNEY'S OFFICE - MASSACHUSETTS
    BY:  BRIAN PEREZ-DAPLE
    John Joseph Moakley Courthouse
    One Courthouse Way, Suite 9200
    Boston, Massachusetts  02210
    (617) 748-3318
    brian.perez-daple@usdoj.gov


On behalf of the Defendant:

    FEDERAL PUBLIC DEFENDER OFFICE
    BY:  SCOTT LAUER
    51 Sleeper Street
    Fifth Floor
    Boston, Massachusetts  02210
    (617) 223-8061
    scott_lauer@fd.org

**P R O C E E D I N G S**

(In open court.)

THE DEPUTY CLERK:  The United States District Court for the District of Massachusetts is now in session, the Honorable Leo T. Sorokin presiding.

Today is September 17th, the case of United States vs. Matthew Haviland, criminal action 19-10312 will now appear before this Court.

Counsel, please identify themselves for the record.

MR. PEREZ-DAPLE:  Good morning, Your Honor, Brian Perez-Daple for the United States.

THE COURT:  Good morning.

MR. LAUER:  Good morning.  Scott Lauer on behalf of Matthew Haviland.

THE COURT:  Good morning.

Good morning, Mr. Haviland.

MR. HAVILAND:  Good morning.

THE COURT:  One moment here.

So Mr. Lauer, your client intends to plead guilty today; is that correct?

MR. LAUER:  He does, Your Honor.  An information has been filed.

THE COURT:  Right.  Hold on one second.

So it's a waiver, first, of indictment, and then a plea?

MR. LAUER:  Yes, Your Honor, although it seems we do not have a waiver, a written waiver at the moment.  So if the Court would require that, we would need to have signed now, although I think the Court could simply inquire, as well.

THE COURT:  I don't have to have a written waiver.

MR. PEREZ-DAPLE:  I don't think so, Your Honor, but I apologize for not bringing one.  The fault is mine.

THE COURT:  I think Maria has one.

MR. PEREZ-DAPLE:  Thank you very much.

THE COURT:  So Mr. Haviland, we're going to do two things today, step by step.  The first is we're going to -- I'm going to inquire about whether you wish to waive your right to be indicted and then -- which has to do with how it is the Government brings the charges before the Court.  And second, I'm going to ask you if you wish to plead guilty and ask you some questions about that.  And so in order for me to allow you to plead guilty or to allow you to waive indictment, I need certain information from you and you'll be answering some questions from me, but that means you'll be speaking.

MR. HAVILAND:  Sure.

THE COURT:  And when you speak, you're giving up a little bit of your right to remain silent.  You might remember before your initial appearance before the magistrate

judge, you were told and explained to you your right to remain silent under the United States Constitution.  So I just want you to understand that you're giving that up to the extent that you speak.

Do you understand that?

MR. HAVILAND:  I do, yes.

THE COURT:  And at any time that you wish to confer privately with, Mr. Lauer, your lawyer you may do so, which means before you answer a question you may confer privately with him.  You can pause after you've started answering at any point, or afterwards, you can confer.  At any one of those points you can confer privately with him.

Do you understand that?

MR. HAVILAND:  Okay.  Sounds good.

THE COURT:  Maria, will you first put him under oath.

(The defendant was duly sworn.)

THE COURT:  So Ms. Simeone is giving you a waiver of indictment form.  Let me explain.

You're charged with a felony -- or felonies -- two felonies.  Three felonies.  The United States Constitution guarantees every person that before the United States Government charges that person with a felony, that a grand jury passes on that and determines there's probable causes.  So in other words, neither the assistant United States

Attorney sitting here, nor his boss, the United States Attorney for the District of Massachusetts, nor his boss, the Attorney General for the United States of America, nor even the President has the power to charge an individual with a felony, unless one of two things happens.

So they can charge them initially, but can't charge them such that they actually would stand trial or be convicted of such crime, unless, (a), a grand jury -- and it's called grand, because it's bigger than a regular jury of 12, it's 23, finds that there's -- based on evidence, that there's probable cause to believe that the person committed the crimes charged and that results in an indictment. The other way it can happen is the person can waive or give up their right to a grand jury indictment, which is one of your constitutional rights, and allow the Government to proceed or begin the case by way of an information.

Once the case is filed, there is no difference between an indictment and an information. It's the same -- the charge -- whatever it's set forth in the charges. The difference is only the title. It says information. And on the last page, if you have a copy of it, the signature line is different, because it will only be signed by a prosecutor, it won't be signed by the foreperson of the grand jury. And other than that, everything that happens thereafter is identical.

Do you understand all of that?

MR. HAVILAND:  I do.

THE COURT:  All right.  Have you had an opportunity to fully discuss your right to a grand jury indictment with Mr. Lauer as your lawyer?

MR. LAUER:  Yes.

THE COURT:  Are you fully satisfied with the counsel, representation, and advice he's given to you regarding that issue?

MR. HAVILAND:  I am, yes.

THE COURT:  All right.  And do you waive your right to indictment and consent to the United States prosecuting you by way of information?

MR. HAVILAND:  I do.

THE COURT:  All right.  So then you can sign the form.

Do you think there's anything else that I need to inquire of him about that?

MR. PEREZ-DAPLE:  Thank you, Your Honor.

MR. LAUER:  May I approach with the written waiver?

THE COURT:  Fine.  I find it's a knowing and voluntary waiver of indictment and I accept it.

You can docket it, Maria.

Okay.  That brings us to the second issue.  First, another question.

You understand that you're under oath and that if you answer any of my questions falsely, answers may later be used against you in another prosecution for perjury or making a false statement?

MR. LAUER:  I do.

THE COURT:  And you understand that that oath you took before you answer the questions about waiver of indictment --

MR. HAVILAND:  Understand the content of the oath before this one?

THE COURT:  Yes.  In other words, you took the oath, then I asked you the questions about the indictment waiver, right?

MR. HAVILAND:  (Nods head.)

THE COURT:  Yes?

MR. HAVILAND:  Yes.

THE COURT:  And the admonition I just gave you that, if you give false answers to my questions, could lead to another prosecution for perjury or making a false statement, that applied to those questions you just answered, even though I didn't give you the admonition first.  So you understand that?

MR. HAVILAND:  Okay.  I understand.

THE COURT:  Does that cause you any concern about any of the answers you already gave?

MR. HAVILAND:  No.

THE COURT:  Okay.  What is your full name?

MR. HAVILAND:  Matthew Francis Haviland.

THE COURT:  How old are you?

MR. HAVILAND:  29 years old.

THE COURT:  How far did you go in school?

MR. HAVILAND:  Through a bachelor's degree and then started a law degree, but ended up retracting my --

THE COURT:  So you obtained the bachelor's degree from college?

MR. HAVILAND:  I did, yes.

THE COURT:  From what college?

MR. HAVILAND:  Emerson college.

THE COURT:  Okay.  And you enrolled in law school.

MR. HAVILAND:  Yes.

THE COURT:  What law school?

MR. HAVILAND:  Roger Williams University.

THE COURT:  All right.  Did you complete the first year?

MR. HAVILAND:  No, I retracted within the refund period.

THE COURT:  Okay.  So you went a little bit, but not very long.

MR. HAVILAND:  (Nods head.)

THE COURT:  You have to say yes or no, just for the

court reporter.  I understand what you mean when you say "Uh-huh," but the record that she's creating is ambiguous if you say that.

MR. HAVILAND:  Okay.  Yes.

THE COURT:  Okay.  Are you a citizen of the United States?

MR. HAVILAND:  Yes.

THE COURT:  Have you been treated for or diagnosed with any mental illness or psychiatric or psychological problem of any kind?

MR. HAVILAND:  Not treated.  I think there may have been a diagnosis in the psych evaluation, but I don't know if that would count as an official one.

THE COURT:  A psych evaluation by counsel in this case?

MR. LAUER:  Yes, Your Honor.

THE COURT:  All right.  Does anything about -- have you seen that diagnosis or evaluation, Mr. Haviland?

MR. HAVILAND:  I haven't read the report, but I've heard of the diagnosis.

THE COURT:  All right.  Does anything about that diagnosis -- are you obtaining -- are you receiving any treatment right now for mental illness or psychiatric or psychological problem of any kind?

MR. HAVILAND:  I'm currently meeting with the

counselor at Donald Wyatt, but as for treatment or other counseling, no.

THE COURT:  Okay.  Is there anything about that diagnosis or your mental -- any mental health condition or psychiatric or psychological problem that makes it difficult for you to understand my questions?

MR. HAVILAND:  No.

THE COURT:  Has any of those diagnosis or mental health issues or psychiatric or psychological problems, whatever they have been diagnosed as, or whatever you might perceive them to be, make it difficult for you to make important decisions?

MR. HAVILAND:  No.

THE COURT:  Okay.  And you understand why we're here today?

MR. HAVILAND:  I do, yes.

THE COURT:  All right.  Have you been treated for or diagnosed with any drug addiction or drug or alcohol problem of any kind?

MR. HAVILAND:  Except for a disciplinary charge at a college for being caught underage drinking, no.

THE COURT:  Are you sober now?

MR. HAVILAND:  Yes.

THE COURT:  Have you ever obtained treatment for alcohol or substance abuse problems?

MR. HAVILAND:  No.

THE COURT:  And as you sit here today, are you under the influence of any medication, drug, or alcoholic beverage of any kind?

MR. HAVILAND:  No.

THE COURT:  Have you received a copy of the information pending against you, that is the written charges made against you in this case?

MR. HAVILAND:  I have, yes.

THE COURT:  Have you fully discussed the charges against you and the facts and circumstances of your case with Mr. Lauer as your lawyer?

MR. HAVILAND:  Yes.

THE COURT:  Are you fully satisfied with the counsel, representation, and advice given to you in this case by your lawyer?

MR. HAVILAND:  Yes.

THE COURT:  Do you understand you've entered into a plea agreement with the United States Attorney's Office.

MR. HAVILAND:  I do, yes.

THE COURT:  Did you sign that agreement?

MR. HAVILAND:  I did, yes.

THE COURT:  All right.  I don't know if you can see this.  I'm holding up this -- do you see that?  Does that appear to be your signature there?

MR. HAVILAND:  I would assume it to be so, yes.

THE COURT:  I can have Ms. Simeone show it to you. The signature above your name.

MR. HAVILAND:  Sure.  Yes, that's it.

THE COURT:  Fine.  Did you read the agreement before you signed it?

MR. HAVILAND:  I did, yes.

THE COURT:  Did you discuss it with your lawyer before you signed it?

MR. HAVILAND:  Yes.

THE COURT:  All right.  I'm going to summarize the agreement.  If you think I missed anything, then tell me.  So what I'm about to do is summarize what's in some of the important provisions of your plea agreement with the United States Attorney's Office.  Do you understand that?

MR. HAVILAND:  I do, yes.

THE COURT:  And do you understand that I'm not -- the entire agreement is what's set forth in the letter, not what I'm summarizing.  I'm just summarizing.

MR. HAVILAND:  Sure.  Yeah.

THE COURT:  So what this provides is that you'll waive indictment.  You'll plead guilty to counts one to three of the information pending against you, charging you with stalking in violation of Title 18 United States Code, Section 2261A, subsection 2, and use of interstate and

foreign commerce to transmit a threat to injure another person in violation of 18 USC, Section 875, subsection C, Counts 2 and 3.  The plea agreement provides you're admitting you committed these crimes and you're, in fact, guilty of each one.  The plea agreement recites that you face the following maximum penalties on each count:

Incarceration for up to five years, supervised release for three years, a quarter million dollar fine, a mandatory special assessment of $100, restitution, and forfeiture to the extent charged in the information.  You understand that if you're not a citizen, pleading guilty might affect your immigration consequences.

You and the United States agree as to how the United States Sentencing Guidelines should apply in your case to the following extent:

You both agree that you have a total offense level of 16, because you have a base offense level of 18 that your offense level is increased by one, under essentially the grouping rules, and then that would lead to 19 and then your offense level is decreased by three for a timely acceptance of responsibility, which leads to 16.  That's why -- that's how you get to 16.  You understand I'm not required to follow this calculation and that you may not withdraw your guilty plea if you disagree with how I calculate the guidelines or what sentence I impose.

The Government will object to the three point reduction for acceptance of responsibility, if at sentencing you do not clearly accept responsibility for the crimes you're pleading guilty to committing and that --

What if he doesn't say anything?

MR. PEREZ-DAPLE:  I'm sorry, if he doesn't say --

THE COURT:  It says at sentencing, defendant, you will reject to a reduction at sentence, based on acceptance of responsibility, if at sentencing defendant does not clearly accept responsibility for the crimes to which he is pleading guilty.  If he merely came to the sentencing and filed no sentencing memo and declined to allocute and said nothing, would he have clearly accepted -- this seems to impose a burden on him.

MR. PEREZ-DAPLE:  I don't think it is intended to, and I have not heard of an instance in which the office has taken the position that silence at the time of sentencing does not constitute acceptance --

THE COURT:  I only ask because I think this might be newer language.

MR. PEREZ-DAPLE:  It is newer language, Your Honor. But I certainly would not expect the office to be taking a position that a defendant who doesn't allocute is not accepting responsibility.

THE COURT:  Okay.  It's a funny way to phrase it.

All right.  So that's what the language says in the agreement.  And at the time of -- or at the time of sentencing, you've committed a new, federal, or state offense, or has in any way obstructed justice.

The Government agrees to recommend at sentencing incarceration for 21 months, a fine within the guidelines range, unless the Court determines that you're not able or not likely to become able to pay a fine, three years of supervised release, a mandatory special assessment of $300, which is $100 on each of the three counts, and forfeiture as set forth in a moment.

The plea agreement provides you're waiving or giving up your right to appeal on direct appeal from the conviction and sentence, to a higher court and that you also are waiving up or giving up your right to file a separate civil lawsuit claiming that serious mistakes were made in this case and that your conviction or sentence should be overturned.  You understand you have these rights and you agree to give them up and you agree you will not challenge your conviction on direct appeal or on any other proceeding, including a separate lawsuit, and you will not challenge any prison sentence of 21 months or less, or any court orders related to forfeiture, restitution, fines or supervised release, even if the analysis that I undertake -- that I reach under the guidelines is different than the ones set

forth in the agreement.

And the Government agrees that it -- regardless of the calculation, it will not appeal any sentence of imprisonment of 21 months or more.  And the agreement provides that after I issue my written judgment, you will lose your right to appeal or otherwise challenge your conviction or sentence as described -- under the provisions I've just described, regardless of whether you later change your mind or find new information that would have led you to not agree to give up these rights and that you're doing so partly in exchange.

The parties agree that despite giving up these rights, you keep the right to later claim your lawyer rendered ineffective assistance of counsel or that the prosecutor engaged in misconduct serious enough to entitle defendant to have his conviction or sentence overturned.

You're waiving -- with respect to forfeiture, you're waiving or giving up your right to any vehicles, currency, or other personal property seized by the United States or state or local law enforcement agency, and this agreement is only between you and the United States Attorney for the District of Massachusetts.  It does not bind the Attorney General of the United States, or any other local, state, or federal prosecuting authority.

Did I miss anything?

MR. PEREZ-DAPLE:  Your Honor, only that a breach on the part of the defendant would give the United States Attorney the right to be released from its commitments under the agreement.

THE COURT:  Correct.  If you breach the agreement, in any way, it gives the Government the right, if they wish to exercise it, to withdraw from the agreement.

Do you understand all that?

MR. HAVILAND:  I do, yes.

THE COURT:  And do you understand that what I've just given you is a summary of the agreement and that the written agreement contains all terms to which you've agreed?

MR. HAVILAND:  Yes.

THE COURT:  Do you believe you understand those terms?

MR. HAVILAND:  I do, yes.

THE COURT:  Do you understand that this is the only agreement --

This is the only agreement between the Government and him, right.

MR. PEREZ-DAPLE:  Yes, Your Honor.

THE COURT:  Do you understand this is the only agreement you have with the United States Government?

MR. LAUER:  I do, yes.

THE COURT:  Has anyone made any other promise or

assurance to you or any different promise or assurance of any kind in an effort to get you to plead guilty in this case?

MR. HAVILAND:  No, they haven't.

THE COURT:  Do you understand that under the plea agreement, the Government has agreed to recommend a particular sentence, among other things, 21 months' incarceration?

MR. HAVILAND:  I do, yes.

THE COURT:  Do you understand that that's only a recommendation.  I could reject that recommendation and -- without permitting you to withdraw your plea of guilty, and I could impose a sentence more severe than you anticipate or even that the Government requested?

MR. HAVILAND:  I do, yes.

THE COURT:  Has anyone attempted in any way to force you to plead guilty in this case?

MR. HAVILAND:  No.

THE COURT:  Are you pleading guilty of your own free will, because you're, in fact, guilty?

MR. HAVILAND:  I am, yes.

THE COURT:  Do you understand that the offense -- the offenses to which you are pleading guilty are felonies?

MR. HAVILAND:  Yes, I do.

THE COURT:  Do you understand that if I accept your plea, you'll be judged guilty of those offenses?

MR. HAVILAND:  Yes.

THE COURT:  Do you understand that by being judged guilty you may lose valuable civil rights, including the right to vote, the right to hold public office, the right to serve on a jury, and the right to possess a gun or any kind of a firearm?

MR. HAVILAND:  I do, yes.

THE COURT:  Do you understand I'll have the power to give you a term of imprisonment of up to five years on each of the three charges to which you are pleading guilty?

MR. HAVILAND:  I do, yes.

THE COURT:  No mandatory minimums, right?

MR. PEREZ-DAPLE:  That's right, Your Honor.

THE COURT:  And do you understand that, in addition to a prison term, I'll have the power to give you a term of supervised release for up to three years?

MR. HAVILAND:  I do, yes.

THE COURT:  Do you understand that if you violate the conditions of your supervised release, you can be given additional time in prison?

MR. HAVILAND:  Yes.

THE COURT:  Do you know what supervised release is?

MR. HAVILAND:  Probation.

THE COURT:  Essentially probation after prison.

MR. HAVILAND:  Okay.

THE COURT:  So what the Government is asking for in their recommendation is that I impose 21 months -- what they anticipate asking for and reserve the right to ask for, is 21 months of prison followed by three years of supervised release.  Supervised release is just our word for -- although it has a few slight differences from probation, but essentially it's supervised -- it is supervised release. You're in the community.  It's like being on probation and there are conditions.  And that three years follows your time -- whatever time in prison I impose.  You understand that?

MR. HAVILAND:  I do, yes.

THE COURT:  And that if you violate the conditions of your supervised release, one of which is you don't commit another local, state, or federal offense, that you report to your probation officer and various other conditions, that your supervised release could be revoked, go to prison, and then you could go to prison, first of all.  You understand that?

MR. HAVILAND:  I do, yes.

THE COURT:  And in fact, then another term of supervised release can be imposed upon you after that time in prison?

MR. HAVILAND:  I do, yes.

THE COURT:  Do you understand I'll also have the

power to fine you up to $250,000 on each of the three counts?

MR. HAVILAND:  Yes.

THE COURT:  Do you understand, by pleading guilty, there may be certain forfeiture consequences and -- as described among other things in the plea agreement and as alleged in the information and that you are waiving or giving up your right to certain property and will be forfeited to the United States?

MR. HAVILAND:  I do, yes.

THE COURT:  Do you understand that --

There is a victim here; is that right?

MR. PEREZ-DAPLE:  Two, Your Honor, yes.

THE COURT:  Two.  Have they received notice of this hearing?

MR. PEREZ-DAPLE:  Yes, Your Honor.

THE COURT:  And are they present or did they not wish to be present?

MR. PEREZ-DAPLE:  Not wish to be present, as far as I know.

THE COURT:  All right, but they were notified of the hearing?

MR. PEREZ-DAPLE:  Yes, Your Honor.

THE COURT:  Do you understand that there are two victims of these three offenses and that I may order you to pay restitution to one or both of those victims for these

offenses, which will be essentially money to compensate them for the harm caused by the crimes that are, at the moment, alleged against you?

MR. HAVILAND:  I do, yes.

THE COURT:  And that, among other things, will likely, if not paid off by the time you were done with prison, be a condition of your supervised release to pay the restitution.

MR. HAVILAND:  Would that have to be within the period of supervised release or would that be possibly an installment plan that could extend beyond it?

THE COURT:  It's possible -- well, at the moment, what I'm saying is that if there is restitution, it will be a condition of your supervised release to pay.

MR. HAVILAND:  Sure.

THE COURT:  The amount that you pay on supervised release will be determined -- the amount you pay each week or each month on supervised release will be determined based on your financial condition and the amount of restitution, neither of which I know now.

MR. HAVILAND:  Sure.

THE COURT:  But -- and I do think the restitution obligation, if not discharged fully during supervised release, survives the termination of supervised release, right?

MR. PEREZ-DAPLE:  Yes, Your Honor.

THE COURT:  So in fact -- does it then get converted into a judgment or some sort of --

MR. PEREZ-DAPLE:  I think it's treated similarly to a tax lien and it will survive at a minimum for 20 years, if it's not paid off before then.

THE COURT:  So yes, it does.  So it's only -- the supervised release is time limited of three years.  The obligation is subject to -- the equivalent of a judgment, which is the US Attorney's Office, which enforces the judgment, could sue you about or collect on for at least up to 20 years.

MR. HAVILAND:  Would that be a civil suit, just out of interest, or would that be a --

THE COURT:  I think it would be a civil suit, yes.  There's not -- for failure to pay in year four or five, in and of itself, in the first instance, it would just be a civil suit.  The exact -- what exactly would occur, if you didn't do that, would be determined by, first, the US Attorney's Office, what they wanted to do about it.  And if, first of all, in their discretion, they wished to do anything about it.  And then if they did, what course they chose and that would depend on what you did.  And so I can't give you advice as to whether that would be limited to civil enforcement actions or not.  So that will depend on what you

do.

But the criminal supervision of you, it would typically be three years, assuming there were no problems during the three years that led to a revocation or extension of that three year period, but I will tell you that what happens to you in that course, you control the keys to it.

MR. HAVILAND:  Sure.

THE COURT:  Because, by what you do or don't do.

All right.  In addition to everything else, you'll understand you'll be required to pay a $100 special assessment on each count for a total of $300.

You understand that?

MR. HAVILAND:  I do, yes.

THE COURT:  All right.  I want to talk to you briefly about the sentencing guidelines.  Have you and your lawyer gone over the sentencing guidelines and how they might apply in your case?

MR. HAVILAND:  We have, yes.

THE COURT:  Do you understand I cannot determine what sentence the guidelines suggest for you until after the probation office has prepared a presentence report?

MR. HAVILAND:  Yes.

THE COURT:  Do you understand the presentence report will contain information about you, your criminal history, if any, and the three crimes you committed?

MR. HAVILAND:  I do, yes.

THE COURT:  Do you understand the report will also contain a recommended application of the sentencing guidelines?

MR. HAVILAND:  I do, yes.

THE COURT:  Do you understand that both you and the Government will have the opportunity to read that report and to challenge any facts reported in it and to challenge the application of the sentencing guidelines recommended by the probation office?

MR. HAVILAND:  Yes.

THE COURT:  Do you understand that although I'm not required to follow the sentencing guidelines, I am required to consider the applicable guideline sentence before I impose sentence on you?

MR. HAVILAND:  Yes.

THE COURT:  Do you understand that the guidelines themselves provide for something called departures, which are within the guideline rules and are a mechanism within the guidelines to reach a higher or lower sentence than the mathematical calculation would otherwise provide for?

MR. HAVILAND:  I do, yes.

THE COURT:  Do you understand that because I'm not required to follow the guidelines at all, I have the legal authority to sentence you anywhere up to the maximum possible

sentence, as long as the sentence I impose is reasonable under the circumstances?

MR. HAVILAND:  I do, yes.

THE COURT:  Do you understand you'll not be permitted to withdraw your plea of guilty if your sentence is longer than you expected, or if you're unhappy with your sentence, or if it's different from any sentence your lawyer might have predicted?

MR. HAVILAND:  I do, yes.

THE COURT:  Do you understand that parole has been abolished and that if you are sentenced to prison, you will not be released early on parole.

MR. HAVILAND:  Yes.

THE COURT:  Do you understand that any victim -- my understanding from the Government is that there are two victims here -- has the right to participate in the sentencing proceeding and that they may do that in person or in writing or both?

MR. HAVILAND:  I do, yes.

THE COURT:  Do you understand that, while generally, you and the Government each have the right to appeal from the sentence that I impose, and in other circumstances appeal from the conviction, and certainly bring separate later challenges to the conviction, that you have given up or waived much of those rights as described in your

plea agreement?

MR. HAVILAND:  I do, yes.

THE COURT:  Do you understand you have the right to plead not guilty to any crime charged against you and to go to trial?

MR. HAVILAND:  I do, yes.

THE COURT:  Do you understand you have the right to a trial by jury?

MR. HAVILAND:  Yes.

THE COURT:  Do you understand that at a trial you'd be presumed to be innocent and the Government would have to prove your guilt beyond a reasonable doubt?

MR. HAVILAND:  I do, yes.

THE COURT:  Do you understand that at the trial you'd have the right to the assistance of counsel for your defense?

MR. HAVILAND:  Yes.

THE COURT:  Do you understand that you'd have the right to see and to hear all of the witnesses against you and to have them cross-examined in your defense?

MR. HAVILAND:  Yes.

THE COURT:  Do you understand you have the right, if you chose to exercise it, to testify and to put on evidence in your defense?

MR. HAVILAND:  Yes.

THE COURT:  Do you understand you'd have the right to invoke the Court's authority to compel witnesses to come to court to testify in your defense?

MR. HAVILAND:  I do, yes.

THE COURT:  Do you understand that you would have the right to refuse to testify and to refuse to put on evidence, unless you voluntarily elected to do so?

MR. HAVILAND:  I do, yes.

THE COURT:  Do you understand that if you decided not to testify or not to put on any evidence, those facts could not be used against you?

MR. HAVILAND:  I do, yes.

THE COURT:  Do you understand that by entering a plea of guilty here today, if I accept your plea, there will be no trial and you'll have waived or given up your right to a trial?

MR. HAVILAND:  I do, yes.

THE COURT:  Counsel, would you state the elements of each -- of the three offenses charged?

MR. PEREZ-DAPLE:  Yes, Your Honor.  Count 1 of the information charges Mr. Haviland with stalking, in violation of Title 18 of the United States Code, Section 2261A, subsection 2.

In order to prove Mr. Haviland guilty of Count 1, at trial the Government would need to prove that he used an

interactive computer service, an electronic communication service, an electronic communication system of interstate commerce, or some other facility of interstate or foreign commerce.  In this case, e-mail.  The Government would then need to prove that Mr. Haviland engaged in a course of conduct that either placed a person, here Victim 1, in reasonable fear of death or serious bodily injury, or that this course of conduct caused, attempted to cause, or would reasonably be expected to cause substantial emotional distress to a person.  Again, to Victim 1 in this instance.

Finally, Government would need to prove that the Government did all this with intent to kill, injure, harass, or intimidate another person.  Again, Victim 1 in this instance.

In order to prove Mr. Haviland guilty of Counts 2 --

THE COURT:  Hold on.  Do you understand, Mr. Haviland, to convict you of Count 1, the Government would have to prove, at trial, beyond a reasonable doubt, each of the things that the prosecutor has just described?

MR. HAVILAND:  I do.  Yes, sir.

THE COURT:  Go ahead.

MR. PEREZ-DAPLE:  Your Honor, Counts 2 and 3 charge Mr. Haviland with use of interstate and foreign commerce to transmit a threat to injure another person, in violation of

Title 18 of the United States Code, Section 875(c).  To prove Mr. Haviland guilty of Counts 2 and 3, the Government would need to prove that, on or about the dates alleged, that Mr. Haviland transmitted a communication in interstate commerce, that the communication in question contained a threat to injure the person of another, that Mr. Haviland intended to send the communication and that he had the purpose of issuing a threat to injure a person, or the knowledge that the communication would be interpreted as a threat.

THE COURT:  Do you understand that to convict you of Count 2 or Count 3, the Government would have to prove each of the things that the prosecutor just described beyond a reasonable doubt?

MR. HAVILAND:  I do, yes.

THE COURT:  All right.  Would you state the factual basis for the plea?

MR. PEREZ-DAPLE:  Yes, Your Honor.  Had the case proceeded to trial, the Government would have offered documentary and testimonial evidence of the following.  First that over the course of approximately three and a half hours, on March 10, 2019, Mr. Haviland sent approximately 28 e-mail messages to Victim 1, a university professor with a professorship in Massachusetts.  Many of those messages were violent and threatening and all appear to have been sent in

response to Victim 1's support for abortion rights.  Several of the e-mails contained direct threats.

The messages, which are reproduced in full in the complaint affidavit in this case, included the following two, which were sent one minute apart on the afternoon -- or the evening, rather, of March 10th.

First, "You will have your face ripped off and eaten by me, personally.  I will enjoy raping your body after you're dead and that will only be the start."

The second message says, "I will rip every limb from your body and eat it piece by piece.  I will kill every member of your family and make them feel like every aborted baby that you have ever put under the thresher."

At trial, Victim 1 and the Victim 1's secretary, who has access to Victim 1's e-mail account and sits just outside Victim 1's university office, would testify that they accessed Mr. Haviland's e-mail messages and were frightened by them.  In addition, the Government would present evidence obtained from Mr. Haviland's internet service provider, establishing that the e-mails to Victim 1 were sent from an IP address that was assigned to Mr. Haviland's residence in Kingstown, Rhode Island.  Testimony from Victim 1 and Victim 1's secretary would establish that the messages were transmitted to and opened in Massachusetts.

Finally, testimony from officers who interviewed

Mr. Haviland after his arrest would establish that in a Mirandized interview, Mr. Haviland admitted to sending the e-mails to Victim 1 in what he called "threatening language." These facts, in summary, would be used to support Counts 1 and 2, the stalking and threats counts.

To establish Count 3, which incorporates a second victim, Victim 2, the Government would introduce evidence that, over the course of about an hour and 40 minutes, on the evening of March 15th and then leading over into the early morning of March 16, 2019, Mr. Haviland sent approximately 12 messages to Victim 2, a professional school at the university in Massachusetts where Victim 1 is a professor.  The e-mails were directed to the admissions office of Victim 2, the professional school.

The e-mails accuse the professional school of racism and included messages such as, "You are horrible, you should be murdered in cold blood."  And "you people are evil, putrid, and somebody should bomb your school for spreading the idea that it's okay to hate people because of their race."

These threats were reported to law enforcement and were sent from the same e-mail account Mr. Haviland used to e-mail Victim 1, which Mr. Haviland admitted, in the Mirandized interview, was his e-mail account.  Officer testimony would establish that Mr. Haviland also admitted to

sending the e-mails to Victim 2 and the electronic evidence would establish that these messages travelled in interstate commerce.

Through e-mails, Internet postings, and testimony from people who knew Mr. Haviland, the Government would also prove that for approximately the year proceeding the e-mails to Victims 1 and 2, Mr. Haviland's views on certain political questions had become more extreme, including views on abortion and other politically charged matters, including racial preferences in education.  This evidence would be used to establish that Mr. Haviland's e-mails to Victim 1 and Victim 2 were sent with the purpose of threatening them, or with the knowledge that the messages would be understood as threats.

And that, in summary, is the evidence on which the Government would rely at trial.

THE COURT:  Did you hear what the prosecutor said?

MR. HAVILAND:  I did, yes.

THE COURT:  All right.  Do you disagree with anything in his description of the facts?

MR. HAVILAND:  No, I don't.

THE COURT:  Are you pleading guilty because you are, in fact, guilty?

MR. HAVILAND:  Yes, I am.

THE COURT:  And you're doing so freely and

voluntarily?

MR. HAVILAND:  Yes.

THE COURT:  All right.  Maria, you can take the change of plea.

THE DEPUTY CLERK:  Please stand and raise your right hand.

I'm sorry, you don't have to raise your right hand. Sorry.

As to Count 1 of the information charging you with stalking in violation of Title 18, United States Code, Section 2261A, subsection 2; Counts 2 and 3, charging you with use of interstate and foreign commerce to transmit a threat to injure another person, violation of Title 18, United States Code, Section 875(c), and forfeiture allegations in violation of Title 18, United States Code, Section 981(a)(1)(c), and 28 United States Code, Section 2461(c).  How do you plead?  Guilty or not guilty?

MR. HAVILAND:  Guilty.

THE DEPUTY CLERK:  Thank you.

THE COURT:  All right.  It's the finding of the Court in the case of United States vs. Haviland that the defendant is fully competent and capable of entering an informed plea; he's aware of the nature of the charges and the consequences of the plea, that the plea of guilty is a knowing and voluntary plea supported by an independent basis

in fact, containing each of the essential elements of the offense charged.  The plea is, therefore, accepted.  The defendant is now judged guilty of those offenses.

As I told you, Mr. Haviland, the probation office will be preparing a presentence report.

Maria, do you have a date for sentencing?

THE DEPUTY CLERK:  I do.  December 10th at 3:00 p.m.

THE COURT:  Fine with you, Mr. Lauer?

MR. LAUER:  That's fine.

THE COURT:  All right.  December 10th at 3:00 p.m.

So they'll be interviewing you.  Mr. Lauer knows that he can be present for that interview.  You'll receive a copy of the draft report and then the final report, but when you review, especially the draft report, but all of it, you should review it carefully, as well as answer the questions made by probation to you carefully and accurately, because this report is very important.  It will affect not only what sentence you receive, but what happens to you after you are sentenced.  For example, if you are sent to prison, it will affect where you are sent and what happens to you when you get there.  So even minor mistakes in the report should be corrected.

At your sentencing, you and Mr. Lauer each will have the opportunity to speak on your behalf.  So I wanted to

tell you about that.

So as you both know -- well, so probation has the practice of preparing confidential recommendations for judges as to what sentence to impose.  That document that probation, when they prepare it, does not address how the guidelines should be calculated.  It simply recommends what sentence probation -- or incarceration, incarceration, what number, and what terms of like how long supervised release and whether there should be a fine and the number.  And then it gives some reasons why, which are drawn from the presentence report.  For example, the person has no criminal record or a long criminal record, or there is harm or not harm, or what have you.

So as you know, I give you, either side, the opportunity to object to that.  So if you wish to object, you can object now, or you can object later.  You can think about it.  But if you want to object, you have to object no later than seven days after the release of the draft report.  That's -- unless you can explain to me why you need more time than that to figure out whether you wish to object.  And then if you did, you can explain to me that, and I would consider that.  I've picked that date, because that simplifies probation's life, because then if you object by then, they won't prepare the confidential recommendation, because if you object, I won't, in all likelihood, take it and then they

don't have to go through the effort of preparing it.  So that's one.

Two, since it's come to my attention that the Government has been making a more sweeping objection -- well, the Government hasn't, actually, in fairness, before me, over the last year, until Friday or Thursday, ever objected to the confidential recommendation, as best I can tell.  But has -- now, is my understanding, is objecting more sweepingly.

And so I guess the question -- because I don't want to take anything from probation to which the Government would be objecting, so I guess I would want to know what is it that the Government is objecting to, so that I can have the chance to not take any of that until I decide whether to overrule or sustain whatever the scope of the Government's objection is.

MR. PEREZ-DAPLE:  Your Honor, if the Government objects in this instance, I will make sure that the objection gives you an indication specifically of what it is that the Government is objecting to, so you can make that determination.

I am also aware of the office's more recent practice, but I'm not prepared today to state what our position in this case will be.

THE COURT:  Fine.  I'm not looking for your position.  I'm just looking, if you're going to object, I want to know what it means.

MR. PEREZ-DAPLE:  Yes.

THE COURT:  And I want to know then, since I know you're -- all of you upstairs are experienced, so I'm going to tell you what I think you know already, because it's my understanding that you might be objecting to some of these things and I don't want to do these things if you want to object to them, without you having an opportunity to at least object and state the basis.  And then I'll hear you out on it, and we can address it like any other issue.

So, for example, sometimes what happens in cases, is I can ask -- (a), not usually before I get the final report, but sometimes.  Certainly sometimes when I get a request for a pre-plea PSR about a criminal history, but sometimes in a case, I may ask probation about either how they calculated the guidelines, like why did you calculate it this way and not that way, or some other issue like that.  I might have those.  And so at the moment, although nothing comes to my mind, to be frank, about this case that would cause me to call probation today, with one exception that I'm going to tell you about in a moment, about the guidelines or anything else like that.

Those things happen.  So I guess what I'm just saying to you, since this issue has arisen and that my view would be if you haven't expressed an objection here, then you're not objecting to it, and if you object later, after it

happened, I'll address what it should be, and whether the toothpaste can be put back in the tube, but I think that will be on all of you, because you all know that those conversations and those kinds of things occur on a regular basis.

This isn't rocket science and it's not news, I think, to anybody.  But I don't want to do it if you object to it, then I want you to tell me in advance and then we can just talk about it and I'm happy to talk about it.  But one issue with that, that I'm going to raise to you, given the issues -- because there is something I'm going to reach out to probation and I would have intended to do it in a -- not on the record in open court, but given what's come up and given the issue and I don't want to -- I want to be above board.

So this case is a case that has two individual victims.  So it's my intent, unless somebody objects to me having this communication in this way and then you can tell me how you wish me to have the communication, but it will be my intent to reach out to probation, to call Ms. D'Addieco, who is the probation officer who is experienced in restorative justice, explain to her the sum and substance of this case, as I understand it, from this hearing.  And tell her to reach out, first, to counsel for the defendant and you and perhaps your victim, I don't know the person's title

exactly, but essentially the victim coordinator, to see whether the -- to explain what -- what kinds of restorative justice programs that probation has available to it and see whether one or both of those victims are interested.

You should understand, Mr. Haviland, that even if you are interested, if neither of those persons are interested, then they don't have to participate.  Whether anything would come of that in some other form, different issue, but they're not going to -- I'm not -- I wouldn't be -- would never expect them to participate in anything that they didn't want them -- wish to participate in.  They could neither of them, or one of them could and one wouldn't, and that would be fine, too.  And they would be, in the first instance, in charge of that.

But so I'm just telling you that, so now it's not an ex parte communication and I would -- it was something that I intended to do, but now I'm putting it on the record, so you know.  And if you don't want me to do it in the manner in which I've described, then you can tell me that and I won't do it in that manner and I will do it and consider doing it in whatever manner you wish me to do it in.  So I think that's -- with respect -- any questions about that?

MR. PEREZ-DAPLE:  To make sure I understand the proposal, Your Honor, you would contact probation, summarize the case, have probation contact counsel for each side, with

the idea that probation would, at some point, be the person in direct contact with the victims about restorative justice options.

THE COURT:  To explain to them what probation could do.  I'm not dictating how Ms. D'Addieco does it, except that it seems to me it would make the most sense for Ms. D'Addieco to have the communication.  Who should participate in that communication, beyond her, I would leave to her to figure out.  I wouldn't be dictating that, so I don't have a view either way about whether -- I don't know if you're the office's -- you are the office's victim --

I don't have a view either way as to whether you should participate in that communication or not.  I don't have a view either way as to whether -- there should be communication first from you to them, because I assume you've already communicated with them, and already have a relationship.  I would leave all of that for you to discuss with Ms. D'Addieco in the first instance.  I think the alternative is I'm perfectly happy to have Ms. Simeone call Ms. D'Addieco, and if she's downstairs, I'm happy to have her come upstairs and, on the record in open court, in public, explain everything to her and then -- of what I've just described.  But that's -- that would be my plan.

And then I would assume Ms. D'Addieco, when it's all said and done, would, in some way -- where that would

lead, I don't know. And I guess what I might say to Ms. D'Addieco is if -- either that, wherever that leads, or whatever inquiry you have with counsel leads you to think that there should be some suggestion as to some sort of restorative justice process in this case, then you could suggest that. Ms. D'Addieco, I would not expect her in the end to suggest that, ex parte, because I would not impose that in this case without giving everybody the opportunity to address it. But whether that would -- I haven't --

I haven't had a case with an individual victim since we've started developing these restorative justice programs and so I assume that if I have imposed it as a condition of supervised release, in some form, in cases, and so whether this would all -- I don't have a vision for how it would exactly express itself. I mean, I don't know what, when it's all said and done, Ms. D'Addieco would talk to me about and -- or would -- would have to discuss.

I don't know if she'd be proposing something for supervised release, if she would be proposing, based on those discussions, nothing. Or whether she would be proposing -- I don't have a -- I don't have anything in mind that she should be doing, except that I do have in mind this. That, based on the crimes which Mr. Haviland has committed, these individuals were harmed. That seems fairly obvious. That's in part why you brought the case, right?

And I think that they're entitled, if they wish to participate in a process -- if they wish to participate in a process, that we should make such a process available to them, if we can, consistent with the law and consistent with what's available to us.  If they don't wish to, then they shouldn't have to participate in it, period.  And I'm not interested in -- I'm not going to make them participate in anything.  And if --

And such a process, in a general way, it seems to me would be focused on the two core principles that I think about.  We've now strayed from just ex-parte communications, but one is that I think that defendants who commit crimes should appreciate that there is harm, actual harm that flows from the crimes.  I'm not saying that Mr. Haviland does not appreciate that, or does.  I don't have a basis to make that determination now, but part of the purpose of restorative justice process is, number one, for that.

And number two is to give the victim a voice in how that harm is repaired.  And so I -- well, I don't know -- I have no idea what sentence would be appropriate in this case. I just know that you're recommending 21 months and I don't know what Mr. Lauer is going to recommend, although I'm betting, if I had to bet -- I'm not a betting person -- he's likely to recommend less time in prison.  And I doubt that you'll fall out of your chair if you see that recommendation.

But I think that the time in prison will not fully heal these people and -- of what they suffered. And so one purpose of a process is, if they wish to participate, to give them a voice in that. And there may be a variety -- the range of things that -- that the Bureau of Prisons are available to me is how long. That's basically it. And the conditions of supervised release are broader, in terms of what I can impose. So there's a whole range and possibility and so that's one.

Two, it may be that out of that process where she talks to the two of you and possibly talks to the victim, that those victims don't want to participate, but there might be a useful process where there's some portion of harm that can be repaired and appreciation that can occur, even though there wouldn't be any involvement in any way, shape, or form by the victims, because that's what they wish and we should respect that wish, and we will.

So in terms of the larger process, that's what I'm thinking about. In terms of the more narrow issue, I would -- unless you object, I would communicate that to Ms. D'Addieco and tell her to follow up with the two of you and your office's victim coordinator. And then I guess what form of response comes back, ultimately whatever -- if there were anything I were thinking about, you would be told about it --  and in some form orally, or in the presentence report.

If you don't wish heard in any way, orally, report back to me about what, if anything, then I will at least consider that, and I might well respect that.  I --

To be practical and frank, there are the -- it's not like drug treatment, where we can just say, is it inpatient, is it intensive outpatient, or is it regular outpatient, or is it just meetings?  Right?  That's pretty much the four options, plus medication assisted or not, as decided by a doctor.

So this is the range of options that you know -- you have some general familiarity, I'm sure with what is done in RISE, so there's that kind of option, whether it's in RISE -- with RISE people or just separate.  There are a range of other options that are available, but whether we're capable of doing them, because whether we have the training and infrastructure or people who can do it.  So there's a whole range of those things and to -- you know, I'm not going to --

I'm not going to do all of that without seeking, in some way, input from all of you, but I guess I would want to know whether -- whether I should have -- other than telling Ms. D'Addieco that, if she had any inquiry questions on that, whether I shouldn't do that in a more formal way.  Like if she wanted to have inquiry about it, then I should convene a status conference and bring in Mr. Haviland and have her

Case 1:19-cr-10312-LTS   Document 35   Filed 11/08/19   Page 47 of 54

47

report it on the record and pose any questions she has.  Or whether, if she wants to know, well, you know, what do you think about exploring this option or that option, whether I should tell her just go and explore it or not, and I should have that discussion just with her.  And I could, perhaps, or perhaps not, direct her to tell you all that.  It depends how formal you all wish it to be.

MR. PEREZ-DAPLE:  Your Honor, I think there's no objections prompting Ms. D'Addieco to being the conversation that you're describing with the parties and then we can act as intermediaries with the victims and see in which direction the conversation progresses and that can inform sentencing recommendations by the parties, at a minimum, and then defer, for now, the question about whether -- what position my office wishes to take on how information should be presented back to you, whether in the form a of confidential recommendation from probation, or an open -- completely open discussion.

THE COURT:  So just so we're clear.  I guess now that we're really thinking about exactly what the issues are, it seems to me that one issue is just at the end of this case, no later than seven days after the draft report, you all, and you, too, Mr. Lauer, unless you tell me now, need to decide just simply yes or no, we object to probation giving the confidential information.  I don't need to know more

about that other than you object to it, or you're not, because that's pretty straightforward.

The secondary question that comes up that I'll communicate with Ms. D'Addieco when I've described, but then there's the question of what, if any, communication about this case that isn't their recommendation, do you have an objection to anything like that.  That has two aspects to it.

One is if, for example -- it's a practical matter. It's not going to come up until we get the final report, in this case, putting aside the RJ stuff.  If I had a question about how she calculated the guidelines, for example, do you only want me to ask that question in open court or not.  I'm confused about what the scope -- because I read the letter and the letter wasn't really about --

The way I read it, it doesn't really seem to me to be targeted as the confidential recommendation, so that's why I'm raising it, because I don't want to have that conversation and find out afterwards you didn't want me to. I want to give you the chance, if you don't want me to have the conversation to tell me don't have that conversation, do it on the record and here's why.  And then I might agree with you, in which case I'll do it that way.  I might disagree with you, but then you'll know that I disagree with you and why.  And then if you wish to appeal that issue, you can, and it's all explained.  And you know -- and I'll have explained

why I did what I did and you'll have explained why you object.  That's all.

But the letter seemed to me to implicate not so much the confidential recommendations, but actually those discussions.  So since it seemed to implicate, by its words, those discussions, that's why I'm bringing it up here and that's why you probably know that this isn't the first time I brought it up, because I'm trying to be conscientious about the issue.  And it is an issue that I have been thinking about for at least a year.  I hadn't thought about it as sweepingly as the letter.  I had thought about it more with respect to the confidential recommendation, because I thought of those other discussions as in a different vein about legal issues.  And -- essentially.

But then there's the question here about the RJ, I'll communicate with Ms. D'Addieco, you can think about.  And I guess what I will tell her, in the abundance of caution, is that if she wishes to communicate back to me, then she should do it by way of first checking with you as to -- and you, Mr. Lauer, as to whether you -- what she wants to communicate with you.  If she doesn't want to tell you what she wants to communicate, then she can say I don't want to tell you, but I want to have the communication and you can decide whether you object to that.  Or if she's perfectly fine, I don't know why she wouldn't want to tell you, but if

there was a reason, then she can tell me what she was going to tell me and how she wishes to communicate it.  And then you all can decide how you want to be.  And if there's disputes, then I'll resolve them, or move forward in the most practical way.

I'm not trying to make it a super-complicated, cumbersome method of communicating, but I don't want to -- I simply don't want to have her coming back and then finding that you don't want me to have that communication just with her.

MR. PEREZ-DAPLE:  Thank you, Your Honor, and I don't foresee a need for you to be having a conversation with probation about the calculation of the guidelines prior to preparation of the draft PSR and so, if it's all right with you, we'll make that seven-day deadline a deadline also to object to the communication about --

THE COURT:  That's fine, I'm not -- other than this conversation with Ms. D'Addieco, this isn't a case where anything comes to my mind that I'd be having any communication with probation about until I got the final report and I don't receive -- in case you don't know that, we don't receive the draft report and so we don't review that. We never see the draft report.  So at least not unless somebody specifically orders it to be produced.

So that's fine.  You can tell me, then, what, if

anything, you object to, whatever, if anything, then.  In the meantime, we'll proceed in the other way with respect to the RJ.

All right.  Once we're on institutional issues. The other thing -- so this looks to me like a different plea agreement than I've seen previously.  I'm not positive, but it seems simplified.

MR. PEREZ-DAPLE:  It is shorter, Your Honor.

THE COURT:  So I say that the idea of making plea agreements clearer and simpler, I am generally in favor of. What I'm about to say doesn't apply to Mr. Haviland, but explaining former provisions to people whose education was a fourth grade education in another country and don't -- never mind don't have any education, but don't have any education in English, and trying to explain these complicated concepts to them that are difficult enough to explain the concepts and then having to explain the language is difficult, and so I'm generally in favor of that approach.

I do -- I didn't read, on page two -- I didn't occur -- I didn't think you actually were taking that position, but the plain and ordinary meaning, which ordinarily it's the plain and ordinary meaning in the controls and contracts, statutes, and other things that we interpret, it could read that way.  So I'm not telling you to change it.  I'm just telling you that the first time I saw it

and I read it, that's what occurred to me, and you could think about that.

And the other thing that just -- I'm not raising now, but you could think about, is that, on page four, where the carveout to the waiver, which limits -- to the misconduct that the prosecutor engaged in, like I'm not taking a view about this, but it comes to mind because there's somebody who's going to be a speaker in November about sentinel events. And one of the sentinel events, I don't know if he's speaking about this one, but one of the sentinel events that I know he's worked on is a detective in Brooklyn who fabricated -- I can't remember the details, but essentially went to prison for misconduct relating to some large number of cases, where he, not the prosecutor, was fabricating evidence. I can't imagine that if that came up, that your office would stand on the limitation that is there, but I literally just read something about the guy the other day. That's what's in my mind.

So I'm not telling you to revise it. I'm not taking a position on that. The plea agreements are, by and large, between all of you, but you could think about that.

Mr. Lauer, any -- you know about the objection to -- anything you want to be heard about any of those other issues or about the objection to the confidential recommendation, or any other communication?

MR. LAUER:  No, Your Honor.  I don't foresee any issue from the defense perspective with communications with the probation department about a restorative justice component in this case.

THE COURT:  Okay.  Fine.  Okay.

Anything else?

MR. PEREZ-DAPLE:  No, thank you, Your Honor.

THE COURT:  Anything else?

MR. LAUER:  No, thank you.

THE COURT:  All right.  We're adjourned.  Thank you very much.

THE DEPUTY CLERK:  All rise.  This matter is adjourned.

(Court in recess at 12:43 p.m.)

**CERTIFICATE OF OFFICIAL REPORTER**

I, Rachel M. Lopez, Certified Realtime Reporter, in and for the United States District Court for the District of Massachusetts, do hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing pages are a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 8th day of November, 2019.

/s/ RACHEL M. LOPEZ

_____
Rachel M. Lopez, CRR
Official Court Reporter