1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

United States of America,       )
                Plaintiff,      )
                                )
                                )
vs.                             )    Case No. 19cr10312-LTS-1
                                )
                                )
Matthew Haviland,               )
                Defendant.      )


BEFORE:   The Honorable Leo T. Sorokin


                        Disposition


                                John J. Moakley U.S. Courthouse
                                Courtroom No. 13
                                1 Courthouse Way
                                Boston, Massachusetts
                                December 10, 2019


                Marianne Kusa-Ryll, RDR, CRR
                   Official Court Reporter
                United States District Court
                 595 Main Street, Room 514A
                  Worcester, MA 01608-2093
                508-929-3399 justicehill@aol.com
              Mechanical Steno - Transcript by Computer

2

APPEARANCES:

United States Attorney's Office
William F. Bloomer, Assistant United States Attorney
John Joseph Moakley United States Courthouse
1 Courthouse Way, Suite 9200
Boston, Massachusetts 02210
on behalf of the Government

Federal Public Defender Office
Scott Lauer, Assistant Federal Public Defender
District of Massachusetts
51 Sleeper Street, 5th Floor
Boston, Massachusetts  02210
on behalf of the Defendant

Also present:

Brett Wingard, Probation

P R O C E E D I N G S

(The following proceedings were held in open court before the Honorable Leo T. Sorokin, United States District Judge, United States District Court, John J. Moakley U.S. Courthouse, 1 Courthouse Way, Boston, Massachusetts, on December 10, 2019.)

THE CLERK:  The United States District Court for the District of Massachusetts is now in session, the Honorable Leo T. Sorokin presiding.  Today is December 10th in the case of United States v. Matthew Haviland --

THE COURT:  Please be seated.

THE CLERK:  -- Criminal Action 19-10132 will now be heard before this Court.

Counsel, please identify themselves for the record.

MR. BLOOMER:  Good afternoon, your Honor.  William Bloomer on behalf of the United States.

THE COURT:  Good afternoon, Mr. Bloomer.

MR. LAUER:  Good afternoon, your Honor.  Scott Lauer on behalf of Matthew Haviland.

THE COURT:  Good afternoon, Mr. Lauer.

And good afternoon, Mr. Haviland.

THE DEFENDANT:  Good afternoon.

THE COURT:  So I have the presentence report.  There aren't really any objections -- there aren't any objections, are there, Mr. Lauer?

4

MR. LAUER:  No, your Honor.

THE COURT:  And you've reviewed the -- and you don't have no objections, do, you, Mr. Bloomer?

MR. BLOOMER:  No, I don't, your Honor.

THE COURT:  And you've reviewed the presentence report, Mr. Lauer, with your client?

MR. LAUER:  Yes, your Honor.

THE COURT:  Okay.  And you both agree that under the presentence report he's a Criminal History Category I.  And so the calculation done by Probation, which results -- it's described in pages 10 and 11 and results in a final offense level of 16, which leads to an advisory guideline range of 21 to 27 months, one to three years supervised release, 10,000 -- well, he can't afford a fine in any event, right, so -- but a fine range of 10,000 to $95,000, and a $300 special assessment that's mandatory.

Do you both agree with all that?

MR. BLOOMER:  Agreed from the government.

MR. LAUER:  Agreed, your Honor.

THE COURT:  All right.  So, Mr. Bloomer, this is -- is this an excerpt of recordings of some --

MR. BLOOMER:  Yes, they're agreed upon.

THE COURT:   -- of the phone calls to the clinic?

MR. BLOOMER:  There's two, two audio recordings on that one disc there --

5

THE COURT:  All right.

MR. BLOOMER:  -- about one minute in length each.

THE COURT:  Fine.  Do you want to play them?

MR. BLOOMER:  Yes, I would like to insert them into my argument, if that's possible, Judge.

THE COURT:  That's totally fine.

Let me tell you both at the outset one thing that I'm thinking about, and then you can respond to it now or incorporate it in your arguments or when you wish, but as I understand -- and oh, I have before me in addition to the PSR, I have, Mr. Bloomer, your sentencing memo.

I have, Mr. Lauer, your sentencing memo with exhibits attached to it, and then I have a letter from Victim 1.

I don't have any other victim statements at this time; is that right?

PROBATION OFFICER WINGARD:  Not that I'm aware of.

MR. BLOOMER:  That's correct, your Honor.

THE COURT:  Okay.  Fine.  And the victims have all received, I assume, notice of the hearing so if they wished to attend they could have?

MR. BLOOMER:  They have, your Honor.

THE COURT:  All right.  And they're not, as far as you know, planning to attend?

MR. BLOOMER:  For varying reasons.

THE COURT:  Yes, that's totally their choice.  I just

wanted -- I only wanted to make sure they received notice that they had the opportunity.  That's their decision.

Okay.  So this is just one thing that I'll tell you that I'm thinking about, and I want you to know about it, and you can respond to it in your argument, or we can address it first, what have you, which is this:  Mr. Bloomer, you recommend 21 months, which by my calculation means that Mr. Haviland would get out of prison in approximately 10 months.  He has about 8 months in.  He would get about three months of good time.  He has been compliant, it appears, at Wyatt.  It's something in that -- in that vein.  Twenty-one minus two -- about three months in good time would be about 18 months.  I think that's about right.  I -- maybe it's 19 months, and then he then would have -- get credit.  He has been not quite 8 months, but close.  So that would put him at something like 10 or 11 months from now, he would be out of BOP custody, if I do what you tell me to do.

If I do what you tell me to do, Mr. Lauer, then he would be out today, because you're asking for time served; is that right?

MR. LAUER:  Correct, your Honor.

THE COURT:  And -- and, obviously, I -- I might do something different.  I could do something in between.  I could do something more.

But one of the -- there are a couple of things that I

have been thinking about.  I have read everything that you all submitted to me, in some cases more than once, and -- and one of the things I'm wondering about in light of those facts is this: I don't really -- I don't have a mental health evaluation of Mr. Haviland that tells me what condition from which he suffers, if he does suffer one.  It certainly seems like from reading the presentence report he has mental health problems, but I'm not a diagnostician.  I don't have a treatment plan as to what sort of plan there ought to be, and I -- whether he gets out, and I'm not -- I appreciate the recommendation and don't -- that he should have a -- you all agree he should have that evaluation, but it seems to me one of -- a couple of the things that I think about in a case like this are one: Will Mr. Haviland do this again?

And, two, would he do worse than this?

And so -- and it seems that, you know, he needs -- it appears that he needs mental health treatment, but it doesn't seem right that today he should be released with no plan, and it doesn't seem -- and it's not clear to me that there would be a plan 10 or 11 months from now.  I don't know what sort of evaluation would happen in the Bureau of Prisons.  I can't control what happens in the Bureau of Prisons.  It's not -- and so I'm -- what that leads me to what I'm wondering is whether I shouldn't continue this so that he can have a full-scale mental health evaluation, with diagnosis, treatment plan proposals,

and then we will all the have the benefit of that.  And then I could hear you all.  I'm happy to hear you now.  I ordinarily don't like to do -- to sort of put off a sentencing once it has been scheduled, and I apologize for bringing it up at the end, but I didn't really have everything and read everything until the last day or two.  So I want -- that's something that -- that's a question really for both of you.

What about that?

MR. LAUER:  To your first point, your Honor, the question of what diagnosis Mr. Haviland suffers from and what a plan of action might be to address it, there was a forensic evaluation --

THE COURT:  I read that.

MR. LAUER:  -- that was performed that did make a -- two diagnoses.  One being of excessive compulsive disorder and another being an anxiety disorder.

The difficulty in -- in setting up a treatment plan is the uncertainty about when he might be released and -- and how to practically accomplish that.  And so I think the Court's general suggestion is a good one.  The Court cannot control what happens to him in the Bureau of Prisons and the manner of treatment he might receive there.  The Court does have the authority to work with the probation office to fashion that sort of treatment plan, and I think that Mr. Haviland would be amenable to meeting with an evaluator, or whoever

the -- whatever process the probation office would -- would use.

THE COURT: Well, I think if there were an evaluator, it might have to be provided by you. I'm not sure.

MR. LAUER: Well, I -- I certainly will make efforts to the extent that I can.

THE COURT: What you -- this is my point. What you each tell me, which makes sense, is that he needs a full scale -- well, maybe you didn't say that, but I think you did, Mr. Bloomer, that he needs a full mental health evaluation and then treatment. And that seems right. And so Dr. Schouten's evaluation seems more it was done a while ago before Mr. Haviland was -- agreed to take medication at Wyatt, which I view as a very positive sign and significant step and -- but it -- it seemed more like a -- did you -- you probably submitted that in the motion to release because it seems to talk about dangerousness and -- and -- but that's some months ago. But it doesn't say he ought to be in this kind of treatment program with this kind of medication and -- and in this way. And so that seems -- and -- and because those are some of -- that's one of the things that I'm wondering about and...

MR. BLOOMER: Judge, I would -- I agree with the Court insofar as that real concerns here is he going to recidivate and is he going to do worse.

My whole point was that the government's recommendation of 21 months would get -- hopefully, get him -- give him time to get a plan in place while he's receiving treatment in a secure facility.

THE COURT:  Sure.  I'm not --

MR. BLOOMER:  So --

THE COURT:  I'm not challenging at the moment either of your, like, the reasonableness of either of your recommendations --

MR. BLOOMER:  Right.

THE COURT:  -- as much as I'm saying, if I do what you suggest, Mr. Bloomer, my concern is this: He perhaps continues to receive his Zoloft or some medication.  I don't what sort of an evaluation he has at Wyatt.  If he goes to the Bureau of Prisons, presumably they continue in some way that.  The -- I don't know what sort of full-scale evaluation that they will do there and what sort of treatment he'll receive there.  Then he gets released and will -- and probation needs to figure it all out and then -- and so we don't really -- the -- the smooth -- the -- the singular most important thing here is that Mr. Haviland doesn't do what he did to anybody else.  That is the number one, I think, most significant thing.  And that needs treatment.  And what sort of treatment?

He's asking, Mr. Lauer, for a lesser sentence than you're proposing, largely on those mental health issues.  And

so I don't know how I -- like, I, in my -- do I think that he has mental health problems here?  Yes, I think the government probably agrees he does.  That's why you recommend he should have a mental health evaluation.  If you thought he didn't have mental health problems, you would not recommend that because you would think properly it's a waste of the taxpayers' money to get that treatment in BOP.

MR. BLOOMER:  Right.

THE COURT:  But the problem I have with -- so, one, I would like that -- I know he has some sort of diagnosis, but I don't know how that translates into a plan of what ought to happen.  And partly what you're saying, Mr. Lauer, that could happen after, and I guess I'm willing to think about that and happy to hear all of you, but that was on my mind, and I wanted to bring that up.

The other question I have is where he is going to live?

MR. LAUER:  There was a -- in our response to the presentence report, we noted that he has a family member, an uncle who lives in New Hampshire, who he has resided with in the past and who he has a good relationship with.  He would be proposing to live there.  We do agree that the prior living environment is -- is not a suitable one at this time.  So there is a residence that we've proposed to the probation office.

THE COURT:  And have they -- you haven't gone to -- no

one has gone to New Hampshire and looked at it?

PROBATION OFFICER WINGARD:  It's in Dover, New Hampshire.  No, we haven't inspected that.  I'll just advise your Honor, we reached out to a social worker at Devens this afternoon to look into what services may be available. That social worker confirmed that they could provide psychiatric, psychological, and social work services at Devens. The level of care would be dependent on the placement by BOP for security reasons and other factors.

The treatment could potentially be any or all of the following:  Medication groups or individual treatment, and they would be able to share whatever evaluative reports with Probation once he gets there.

THE COURT:  What, if any, treatment he would receive we wouldn't know because that would depend on what they would determine when he got there?

PROBATION OFFICER WINGARD:  Exactly.

THE COURT:  Right.  Okay.  Any further thoughts on that?

MR. LAUER:  Your Honor, I -- I think we're all sort of dancing around the same topic here in that I think the parties are in agreement that mental health is at the forefront; and, your Honor, I think, is warranted in wanting to know, you know, practically speaking what -- what that means.

So if the Court is inclined to continue the

sentencing, I'm confident that I can arrange for an evaluator of some sort to provide one or more updated psychiatric report or recommendation as well as a -- more of a plan, as opposed to a forensic profile, which was the --

THE COURT:  Sure, exactly.  You had a different purpose in that.

MR. LAUER:  Correct.

THE COURT:  And because what I'm struggling -- what I'm thinking about is what is -- what sort of treatment does he need, how amenable to treatment is he, what is his likelihood of committing this offense again, what is his likelihood of doing worse, and then those are part -- those aren't the only things that are relevant.  There's obviously the serious offense, the serious harm, what kind of punishment is appropriate under the circumstances, a variety of factors, but how -- but that piece seems to be a central piece, and I don't know how I decide what sentence to impose without really understanding fully that.

And so do you have a view about that, Mr. Bloomer?

MR. BLOOMER:  I think the Court has indicated -- has kind of answered its own question.  I think you need the information in place before you can make an intelligent decision.

THE COURT:  I mean, that's my view, but I'm -- really, I'm asking you because you're, like -- if you're disagreed, you

know, I would listen to you about that.

MR. BLOOMER:  No, I wouldn't disagree in so far -- provided, of course, that he's held.

THE COURT:  No, I'm not releasing him today.

MR. BLOOMER:  No.  Not that I think the Court would, but I -- I just put it out there on the record.

THE COURT:  Right.

MR. BLOOMER:  But I don't think it's an unreasonable approach.

MR. LAUER:  I -- I'm not opposed to that, your Honor. I would agree to a continuance, and I would just ask -- I may need approximately 30 days with the holidays to --

THE COURT:  So why don't I do this.  Why don't I reset the sentencing date for late January, which gives you a little more than 30 days to both get it done and file it, at least file it in advance of sentencing so Mr. Bloomer can look at it, and I can read it and then see.  And if -- and why don't -- so, Maria, how about a date near the end of January?

THE CLERK:  January 22nd.  January 22nd at two o'clock.

MR. LAUER:  Could I ask for the following week?

THE COURT:  Yes.

THE CLERK:  Okay.  How about January 27th at 2:30?

MR. LAUER:  That's fine by me.

MR. BLOOMER:  That's fine for the government, your

Honor.

THE COURT:  All right.  So if -- Mr. Lauer, why don't you -- you can confer after you figure out your schedule.  You have your evaluator and the report, and if it all seems on track for that date just tell Mr. Bloomer, but if you think something about the schedule is going to be -- needs to be different because it's taking longer to get the report or because Mr. Bloomer after he looks at the report wants to have a responsive report, or I don't know what, then tell Ms. Simeone in some way or file something to tell me.

MR. LAUER:  I will.  Thank you, your Honor.

THE COURT:  Let me just say a couple of things before we adjourn.

One is I know that there -- do you have family?  Does he have family?

MR. LAUER:  Yeah, his mother, his uncle, and his aunt are all in the courtroom.

THE COURT:  Okay.  Is this the uncle from New Hampshire or --

MR. LAUER:  No, this is his uncle Dennis Martin, who provided the letter to the Court.  He resides in Rhode Island.

THE COURT:  Oh, yes.  So -- and this can in part, you can relay this, if you wish, you can relay to the victims.  Although they're not here, their interests are important and I think about them.

So one is, I understand that people -- we have this date and people focus on it, and it's significant and it's both important and stressful, and people may be unhappy that it's continued but -- but this is -- and this is a serious and important matter.  It's important to do these -- to do this correctly and with all the appropriate information.  I just think that this information is important for making a fair and proper decision, and so I think it's unusual.  I don't like to do this.  I don't do it very often, but this is one of those cases where I think that the -- the fair and correct thing to do is continue to get this further information.

The second I will tell you, Mr. Haviland, you obviously have a choice in this process to some degree, and I understand that at times you haven't wanted to have mental health treatment.  And it appears to me from what I read in the presentence report that you are softened in your view about that.  And so I would urge you to cooperate fully in the evaluation, and I'd urge you to be amenable to treatment.  And just as I'm sure if you fell -- whether you were before you were arrested or if you were walking down the hallway and slipped and you fell and you broke your leg, and they told you needed surgery to correct that, and you needed physical therapy and you needed medication, I find it hard to believe that you would resist that.

And so for the same reason, I suggest that you be open

and amenable to this treatment and to -- initially to the evaluative process and what is recommended to you.  Nobody is trying to brainwash you.  Nobody's trying to change -- your entitled in this country to whatever views you wish to hold.

And you're not here because you were not being prosecuted or you're not in prison because of your political opinions or your views, whether they're about the president or about abortion or about anything else.

It's because of threats, and that's different.  And so -- and you're obviously a very intelligent young man.  And so I urge you to participate and be amenable to that.

All right.  And to those people who came for the sentencing, I'm sorry that we're not -- I understand it's a burden to come to the courthouse, whether you're family members or you're other interested parties, and I understand that putting it off is -- can be frustrating.  It's time-consuming. This isn't the easiest place to come to, but I think it is an important matter, and I don't think these kind of matters should be rushed unnecessarily.

And so I'm sorry that it was pushed off.  You're all welcome to come back the next time.  On the other hand, if you don't because you're unable to, I won't draw any inference.  I won't come to some conclusion about what it means that you weren't here.

Is there anything else?  And I should say that

probation, what he was reporting from Devens was -- I asked probation today to find out what sort of services were available, psychiatric or psychological at -- particularly at Devens because I do understand that Mr. Martin and his wife -- that's his name, right?

MR. LAUER:  Excuse me.

THE COURT:  It's Mr. Martin, right?

MR. LAUER:  Yes, Dennis Martin.

THE COURT:  Dennis Martin and his wife have been visiting you, Mr. Haviland, every week since you have been in custody.  And so I, likely, if I don't impose -- if I impose a sentence of incarceration beyond the date of whatever sentencing, and I haven't at all decided what sentence to impose, I would likely recommend that you be -- go to Fort Devens in large -- in part simply because Devens is a place that they could reach if they wished to continue to visit you. That seems like it would be important; and if you go to any other federal prison, as a practical matter, I don't think it would be possible for you to visit them regularly.

Okay.  And so that's why Probation was reporting on that.  I asked him.

Anything else?

Mr. Bloomer, I'm going to give you this back.

MR. BLOOMER:  Okay.

THE COURT:  If you wish.  You can do either, if you

want to play it when we have the sentence --

MR. BLOOMER:  No, we'll hold off.

THE COURT:  -- I'm happy to have you hold it and play it then, or if you want I can take it back to chambers and listen to it sometime before.

MR. BLOOMER:  I'll just hold onto it, your Honor.

THE COURT:  Thank you.

Is there anything else from Probation today?

PROBATION OFFICER WINGARD:  Nothing, your Honor.

THE COURT:  Anything else, Mr. Bloomer and Mr. Lauer?

MR. BLOOMER:  Nothing from the government.

MR. LAUER:  No, your Honor.

THE COURT:  Okay.  Then we're adjourned, and the defendant's remanded to the custody of the marshal's service.

Thank you very much.

THE CLERK:  All rise.  This matter is adjourned.

(At 3:22 p.m., court was adjourned.)

20

C E R T I F I C A T E

I, Marianne Kusa-Ryll, RDR, CRR, do hereby certify that the foregoing transcript is a true and accurate transcription of my stenographic notes before the Honorable Leo T. Sorokin, to the best of my skill, knowledge, and ability.

/s/ Marianne Kusa-Ryll                    1/22/2020

Marianne Kusa-Ryll, RDR, CRR                    Date

Official Court Reporter