1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,       :       CRIMINAL ACTION
                                        No. 19-10312-LTS-1

        Plaintiff,              :

             v.                 :

MATTHEW HAVILAND,               :

        Defendant.              :

: : : : : : : : : : : : : : : : : : : : : : : : : : : : : :

BEFORE THE HONORABLE JENNIFER C. BOAL,
UNITED STATES MAGISTRATE JUDGE
**DETENTION HEARING**

APPEARANCES:

For the United States of        United States Attorney's Office
America:                        BY:  BRIAN PEREZ-DAPLE, AUSA
                                1 Courthouse Way, Suite 9200
                                Boston, MA  02210

For the Defendant:              Office of Federal Public Defender
                                BY:  SCOTT LAUER, AFPD
                                51 Sleeper Street, 5th Floor
                                Boston, MA  02210

                                U. S. District Court
                                1 Courthouse Way
                                Boston, Massachusetts  02210
                                Tuesday, July 16, 2019
                                2:15 p.m.

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

_____

**JANICE RUSSELL TRANSCRIPTS**
**1418 Red Fox Circle**
**Severance, CO  80550**
**(757) 422-9089**
**trussell31@tdsmail.com**

2

INDEX

| EXHIBITS: | Marked | Received |
|---|---|---|
| US-1, 4, 5 | 3 | 4 |
| US-2-3 | 4 | 4 |

3

P R O C E E D I N G S

THE COURTROOM DEPUTY:  Today's July 16, 2019.  We're on the record in the matter of United States v. Matthew Haviland.  Case Number is 19-mj-7085.

Will counsel please identify themselves for the record?

MR. PEREZ-DAPLE:  Good afternoon, your Honor.  Brian Perez-Daple for the United States.

THE COURT:  Good afternoon.

MR. LAUER:  Good afternoon.  Scott Lauer on behalf of, of Mr. Haviland.

THE COURT:  All right.  Good afternoon.

So we're here for a detention hearing.  Are we going forward with that hearing?

MR. PEREZ-DAPLE:  Yes, your Honor.

THE COURT:  All right.  And I have some exhibits here. I assume, from the Government.  It looks like -- well, I have three paper ones, Exhibits 1, 4, and 5.

Mr. Lauer, do you have -- have you seen those exhibits?

MR. LAUER:  I have, your Honor.

THE COURT:  And --

MR. LAUER:  There's no objection to those exhibits.

And then the parties intend to proceed by way of proffer --

THE COURT:  All right.  And --

MR. LAUER:  -- as to the facts.

THE COURT:  And how about Exhibits 2 and 3?

MR. PEREZ-DAPLE:  Your Honor, I have an audio disk copy here for the Court and I'll be playing them during the proffer off of my laptop, which is at the podium.

THE COURT:  All right.

And any objection to those, Mr. Lauer?

MR. LAUER:  No, your Honor.

THE COURT:  All right.

So Exhibits 1 through 5 are admitted into evidence for purposes of this hearing.

(U.S. Exhibits 1 through 5 admitted in evidence)

THE COURT:  Only -- and I will note, Mr. Lauer, you filed an exhibit under seal.

MR. LAUER:  Yes, your Honor.

THE COURT:  Mr. Perez-Daple, any objection to my consideration of that exhibit?

MR. PEREZ-DAPLE:  No, your Honor.

THE COURT:  All right.

So that exhibit is admitted as well for purposes of this hearing, only.

Mr. Perez-Daple, you may proceed.

MR. PEREZ-DAPLE:  Thank you, your Honor.

Here's the proffer that the parties agree to.  We'll

begin by making reference to the complaint affidavit, which we'll deem Exhibit 1.  You have a copy there.

THE COURT:  And just so I understand, this is a jointly agreed to proffer, is that --

MR. PEREZ-DAPLE:  Yes.

THE COURT:  -- correct, Mr. Lauer?

MR. LAUER:  For pur -- yes.  For purposes of this hearing --

THE COURT:  All right.

MR. LAUER:  -- it is agreed to.

MR. PEREZ-DAPLE:  And, your Honor, to, to reorient you, you'll recall that Mr. Haviland is charged by complaint with stalking and with making threats.  And the e-mails that are the basis of those charges are contained in the complaint affidavit and are what we begin with here.

First, Mr. Haviland sent the e-mails to Victim 1 that are described in Paragraph 9 of the complaint affidavit.

Second, Mr. Haviland also sent the e-mails to the professional school described in Paragraph 11 of the complaint affidavit.

Third, Victim 1 is fearful for himself/herself and for his or her family as a result of the March 10, 2019 e-mails from Mr. Haviland.  Victim 1 fears that the sender of the e-mails may act upon the threats.  Victim 1's assistant is also worried for his or her safety because of the threats.

Fourth, overnight, on or around April 3rd to April 4th of 2019, Mr. Haviland left over 100 voice messages at a women's medical clinic in Rhode Island that is advertised as an abortion clinic.  Law enforcement obtained approximately 84 distinct recordings of those voice messages from the clinic, some of which likely contained multiple voice messages merged into one digital file.  Of the 84 or so recordings, approximately 63 contained messages that were aggressive or threatening and/or contained strong anti-abortion rhetoric.  Approximately 20 recordings contained messages that were apologetic and one recording contained both.

In the aggressive messages Mr. Haviland spoke of babies being murdered and drew comparisons between Nazis and a doctor who worked at the clinic.  In some he screamed or raised his voice and in some he made explicit threats.

And now, with the Court's permission, I'll play Exhibit 2.

(Audio recording played)

MR. PEREZ-DAPLE:  In approximately 20 of the messages, however, Mr. Haviland was quiet and apologetic.  And I'll play Exhibit 3, as an example.

(Audio recording played)

MR. PEREZ-DAPLE:  Proceeding on, your Honor, we've already discussed the e-mails to Victim 1 and to the professional school.

Fifth, Mr. Haviland sent the text messages to Individual 1 and Individual 2 that are reproduced in Exhibits 4 and 5 to the detention hearing.  Those are the hard copies that you have there.

On or about April 25, 2019, the FBI interviewed Individual 1, a college friend of Mr. Haviland's, who stated that he or she was relieved that Mr. Haviland was in custody. Individual 1 stated that he or she believed Mr. Haviland is a danger to himself and others and that Mr. Haviland has the capacity and general desire to harm people.  Individual 1 was concerned that the "bear was poked" by Mr. Haviland's arrest.

On or about April 25th and April 29th, the FBI also interviewed Individual 2, another college friend of Mr. Haviland's.  Individual 2 confirmed that the text messages in Exhibit 5 were unsolicited and said that he or she blocked Mr. Haviland's number after the March 2, March 29, 2019 text message exchange that you'll see in Exhibit 5.

On April 25th, Individual 2 stated that he or she was never in fear of Mr. Haviland and did not think Mr. Haviland would harm anyone else, though he might harm himself.

On April 29th, however, Individual 2 stated that he or she believed Mr. Haviland could be a danger to others. Individual 2 reported that the unsolicited text messages made him or her feel upset, uncomfortable, and worried.

Six, as described in Paragraphs 21 through 23 of the

complaint affidavit, police made at least five wellness checks on Mr. Haviland between June 2018 and April 2019 with three of those checks coming in April 2019.

Seven, aside from the communications themselves, to date agents have not discovered evidence evincing an intent to Mr. Hav, on Mr. Haviland's part to carry out the threats contained in the communications that have been discussed in this proffer.

And eighth, during the search of Mr. Haviland's home on the date of his arrest agents did not find any weapons or recover any non-digital evidence relating to Victim 1 or to any of the other people or entities discussed in this proffer.

That's all.

THE COURT:   Thank you.

So, Mr. Perez-Daple, did you wish to argue --

MR. PEREZ-DAPLE:   Yes.

THE COURT:   -- about detention?

Or, Mr. Lauer, do you wish to add anything about, to the facts?

MR. LAUER:   I don't have anything to add.

THE COURT:   All right.

MR. PEREZ-DAPLE:   Thank you, your Honor.

We believe that detention is warranted here because of the risk of obstruction of justice and because we believe no conditions will reasonably assure the safety of the community

9

here.  We believe there's clear and convincing evidence that Mr. Haviland poses a risk, a continuing risk of threatening or injuring a witness, or at least attempting to do so, and that no conditions will reasonably assure the safety of the community.  And I think it's important to keep in mind that the safety here is both the physical safety, which is, to some degree, addressed in the report submitted by the defendant, but also the safety of the community from threats like the ones discussed in the complaint affidavit and that we heard today.

The most important thing, I think, is that the factors that led to Mr. Haviland's conduct in the first place, which are threats to the people that would be witnesses in this trial, those factors are all still present today, if he were to be released.  There's been no change that we know of in his physical or emotional condition since the time immediately prior to his arrest when he made the threats that are the basis for his arrest and there would be no change in his physical circumstances except, as I understand it, Mr. Lauer proposes restricting his access to the Internet.  But he would be back in the same home living with the same person and I think it's important that we note that in the report submitted by the defendant the doctor reports that Mr. Haviland had reported feeling suffocated and trapped living in his mother's home.  As I understand it, the proposal was to send him back there under home detention or home confinement where he, actually, under

10

court order, would be trapped in his mother's home.

Also, Page 9 of the report submitted by the defendant suggests that the negative changes in Mr. Haviland's behavior that started toward the end of 2018 and continued into 2019, in part, resulted from feeling dependent on his mother for support and yet, as I, as I point out, the proposal is that he go back to live with his mother and, and we think that's particularly concerning, given the family history that is described at the bottom of Page 3.

Here, we think the nature and the circumstances of the offense charged and the other factors discussed in Section 3142(g) all point in favor of detention.  So the crime itself both are crimes of violence, the stalking crime and the threatening charge, which, of course, by its nature as an element includes a threat of an injury or physical harm to another person.  These are incredibly frightening behaviors for the people that are recipients of the threats.

So Mr. Haviland's conduct has the capacity to inflict psychological harm, as it has on some of the people that we've discussed today.

And we've also discussed that the, the charged crimes, the e-mails to Victim 1 and to the professional school, are accompanied by similar conduct, the calls to the abortion clinic, the text messages, including in Exhibit 5 you'll see hundreds of unsolicited text messages to Individual 2 over a

period of just a few days.  Some of those are directly threatening and those include the ones quoted in the complaint affidavit in Paragraph 15 that say, "I'm beyond caring how I sound.  It's literally killing babies.  That's all it is and we want you to stop it, or we will kill you to do it.  It's that serious.  It's not a joke."

This sort of behavior is easy to do and it's hard to stop.  I understand that there's a proposal that Mr. Haviland be denied Internet access, but unless he is actually physically kept in that home without ever leaving it -- and the home is confirmed to be free of a telephone and Internet and a phonebook -- he has the capacity to step outside the house and make a call like this or visit a library and set up an anonymous e-mail account and send threatening messages of the kind that, that he has been doing in the earlier part of 2019.

Returning to the 3142(g) factors, the weight of the evidence here is strong.  It's a fairly straightforward case. The digital evidence ties it directly to Mr. Haviland and then in a post-arrest interview, as reflected in the proffer here, Mr. Haviland did, in fact, send the e-mails that are the basis for the complaint.

Turning to the history and the characteristics of the defendant, although acknowledging that he does not have a criminal history or a history of violence, he does have a history of instability, which, I think, we've seen reflected

and is relevant to the risk that he poses if released.  The risk of danger that he causes to others is high.  He's unpredictable.  The risk of physical danger may be lower, as, as reflected in the doctor's report, but it's not negligible and it's the sort of thing that, if it were to happen, you would look back and think all of the warning signs were there and I think we shouldn't ignore them.

The proposed conditions that I understand don't assure the safety or protect against the risk of obstruction.  We've already discussed why this conduct is hard to police and importantly, although the defendant has been evaluated by the doctor, he hasn't undergone a full medical workup to determine what underlying conditions may be the cause of what is manifesting itself in this disorder described in the report.  And this is reflected at, at the end of the report where the doctor acknowledges that one of the things that should happen is that Mr. Haviland undergo a full medical workup.

And further, although there is a proposal that as a condition of release he accept mental health treatment, there are indications that he won't accept psychiatric treatment if offered and I think there's a real concern that if he's only doing so as a condition of release or in order to get released, that that is not a meaningful participation in any sort of mental health treatment, nor do we have a sense yet how effective that would be in changing his behavior.  We don't

have a history of treatment yet. So we don't know how he would respond or, if he entered treatment and it were effective, how long it would be, how long it would take to take effect.

So for those reasons, we think there's clear and convincing evidence that he poses a risk of harm to the community and also an obstruction risk of threatening, at a minimum, the witnesses against him and that no conditions would reasonably assure that he wouldn't obstruct or pose a danger to the community.

THE COURT:  Thank you.

Mr. Lauer?

MR. LAUER:  Yes, your Honor.

This is, perhaps, a difficult case from a detention perspective. On, on the one hand, you have Mr. Haviland's background, no criminal history, gainful employment, a graduate of Emerson College, and then, on the other hand, you have those messages, the tone of which is extremely agitated and, and disturbing.

So what we have today that we didn't have at his initial appearance is more insight into what's going on. I would urge the Court to read Dr. Shouton's (phonetic) report carefully. Dr. Shouton is someone who is an authority in this field. He's actually, if you review his CV, he has done trainings for the U. S. Attorney's Office in threat assessment. His conclusions are that untreated mental illness played a

significant part in this conduct and that from a risk perspective, although risk is there, some risk is there, that risk can be mitigated by conditions.

So with all that in mind, your Honor, we are proposing a series of conditions designed to mitigate whatever degree of risk he presents.  And specifically, we are proposing home detention with electronic monitoring.  We are proposing that he be referred to a mental health evaluation and that he follow through with any recommended treatment, whether that includes counseling, medication, psychological testing.  He in the past has been unwilling to engage in that and, in fact, that's the great tragedy of, of this case in, in many ways.  Mr. Haviland has been deteriorating psychologically for several years now and having spoken to his family members, the Government has spoken to friends from college, everyone has noticed this and unfortunately, it took an event to serve as a reality check and the past few months have been a greatly sobering experience for him.  And I can represent to the Court that despite the fact that he has been unwilling to engage in psychiatric treatment in the past, that is no longer the case.  He will follow through and abide with any form of treatment that is recommended.

So that is a, I think, a very important condition. We're also proposing that he obviously not have contact with any witnesses or victims in the case and that he be tested,

that he abstain from any drug or alcohol use and that he be tested to ensure compliance with that.

Those conditions, by the way, are, are modeled on a series of conditions imposed by Judge Hennessy in a somewhat similar case.  It's the Frisiello case.  I'm sorry.  I, I did not print the citation.  But Frisiello is F-R-I-S-I-E-L-L-O. Mr. Frisiello was also charged with threatening conduct and, in fact, through the mails, mailing powders, and he presented, also, with serious mental illness and after a hearing at which the Government made substantially the same arguments that the Government is making today, Judge Hennessy saw fit to release him.

We would urge the Court to, to reach the same conclusion here.  The Government has not met its burden in this case and it is the Government's burden to establish by clear and convincing evidence that there are no conditions that can ensure the safety of the community.  And we think that on balance, knowing today more specifics as to his psychiatric history, that he can be released and that he will abide by the conditions set by the Court.

This is a gentleman who has never been in trouble before.  He had the police coming to his house for wellness checks in the days and weeks before his arrest.  This, this didn't come out of nowhere.  There's a reason for it and the reason for it has to do with his mental functioning, his mental

health, and unfortunately, there's a limited amount he can do at the Wyatt Detention Center right now to set up a comprehensive treatment program.

So it -- it -- it is true that as we stand here today we're in substantially the same position as we were in a couple months, a couple months ago in the sense that he hasn't had a, a full workup of, of psychological testing.  He hasn't been prescribed any medications, but I'm confident that the Office of Pretrial Services is capable of referring him to the appropriate treatment providers and ensuring that he follows through, as directed.

So those are the proposed conditions that we would be offering the Court and we would respectfully suggest that release would be warranted with those conditions.

THE COURT:  All right.  Thank you.

I will take it under advisement.

MR. LAUER:  Oh, and excuse me, your Honor.

THE COURT:  Yes.

MR. LAUER:  I -- I didn't -- I didn't mention that he, he is also prepared to abstain from Internet usage.  I think all of his Internet-capable --

THE COURT:  Uh-huh (indicating an affirmative response).

MR. LAUER:  -- devices were seized at the time of his arrest.  He will abstain from, from any Internet activity

17

unless receiving prior authorization from the Probation Department.

THE COURT:  All right.  Thank you.

THE COURTROOM DEPUTY:  All rise.  This Court's in recess.

CERTIFICATE

I, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

/s/ *Janice Russell*                    March 17, 2020

Janice Russell, Transcriber                Date